UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **MICHAEL D. ANDERSON**, | Case No. 2:15-cv-01305-KI |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security**, | |
| Defendant. | |

    Katherine L. Eitenmiller
    Robert A. Baron
    Harder, Wells, Baron & Manning, P.C.
    474 Willamette, Ste. 200
    Eugene, OR 97401

        Attorneys for Plaintiff

    Billy J. Williams
    United States Attorney
    District of Oregon

Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Thomas M. Elsberry
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Michael Anderson brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for a period of disability and disability insurance benefits ("DIB"). I reverse the decision of the Commissioner and remand for a finding of disability.

## BACKGROUND

Anderson filed an application for DIB on March 18, 2012, alleging disability beginning May 1, 2011. The application was denied initially and upon reconsideration. After a timely request for a hearing, Anderson, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on October 28, 2013.

On November 6, 2013, the ALJ issued a decision finding Anderson not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on May 15, 2015.

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified a history of lumbar degenerative disc disease with peripheral neuropathy, status post laminectomy and SCS implantation as Anderson's severe impairments. The ALJ found that these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. Given these impairments, the ALJ concluded Anderson is capable of performing light work. However, Anderson is unable to climb, stoop, balance, kneel, crouch or crawl on more than an occasional basis. He will also require the option of changing positions between sitting and standing at least once every 30 minutes throughout the workday. Given this residual functional capacity ("RFC"), the ALJ found Anderson unable to perform his past relevant work, but he could perform other work in the national economy such as assembly-small products, shipping/receiving-small parts, and sorter-small parts. Accordingly, the ALJ found Anderson not disabled within the meaning of the Act.

## FACTS

High-school educated, and 50 years old on the date of his alleged disability onset, Anderson has a work history as a heavy equipment mechanic and shop supervisor. He was laid off from his employment as a mechanic in May 2011. He collected unemployment insurance.

Christopher Miller, M.D., a neurologist, treated Anderson from May until November 2011. At his first meeting, Anderson reported experiencing paresthesias in the soles of his feet for the past six months. The feeling came when sitting, standing, and walking, but it went away at night. Dr. Miller thought he looked healthy, although he did note a decrease to pinprick in the ball of Anderson's foot, with an otherwise normal stance and gait. He set Anderson up for nerve conduction studies and an EMG because he thought Anderson had tarsal tunnel syndrome. The doctor reported the results as abnormal, reflective of bilateral tibial mononeuropathy (tarsal tunnel syndrome). After the surgery, Anderson noticed some improvement in his pain, but thought it was too soon to tell. Three months later, Anderson told Dr. Miller he was no better. He still felt burning paresthesias in his feet, especially when he sat for long periods but also when he stood and walked. An MRI revealed mild facet hypertrophy at L4-5 and degenerative disc disease, with a small disc bulge and annular tearing, at L5-S1. Tr. 219-239

Anderson established care with Rose Kenny, M.D., in November 2011, complaining of peripheral neuropathy. Anderson thought the tarsal tunnel surgery made his right foot worse. Dr. Kenny prescribed a Butrans patch and Nucynta. She noted Anderson's painful lower back into the bilateral SI joints and into his legs, with painful bilateral feet which hurt to the touch. She also noted normal gait, balance, motor and deep tendon reflex ("DTR") equal and symmetrical. She noted abnormal monofilament. Dr. Kenny referred Anderson to Mark Belza, M.D.

Dr. Belza examined Anderson in December 2011 and January 2012. Anderson reported a history of bilateral numbness and tingling in his feet, and a burning feeling in the bottoms of his feet. Motor strength was normal, sensation was decreased in the balls of the feet, and he tested

positive on the compression test on the right lumbar spine. Dr. Belza assessed peripheral neuropathy, low back pain, radiculitis, and facet arthrosis. Imaging revealed degenerative change and minor spurring at the L3-4 facet joint, and early degenerative disc disease at L5-SI. Tr. 258. A CT of his lumbar spine was essentially negative. Tr. 259. A lumbar myelogram was also normal. Dr. Belza did not know the source of the peripheral neuropathy and recommended a neurology consultation.

When Anderson returned to Dr. Kenny in January 2012, he reported that his back still felt sore and stiff, but his feet did not feel as numb and the burning in his feet was much better. He experienced good pain relief, except on really active days, with the Butrans patch.

The neurologist, Gary Buchholz, M.D., treated Anderson in March 2012. Dr. Buchholz recorded that the gabapentin did not really help and that the Butrans patch did help, but Anderson did not like using it. Anderson's gait was normal, including heel, toe and tandem, and his motor exam was normal. The doctor noted mild hypalgesia to the midfoot on both feet. Tr. 245-46. A needle EMG did not show abnormalities and the motor conduction was normal. Dr. Buchholz recommended increasing Anderson's gabapentin.

In April 2012, Anderson continued to demonstrate low back pain and an abnormal monofilament. He stopped using the Butrans patch due to side effects and started taking Gralise (which contained gabapentin) instead. Tr. 256.

Anderson returned to Dr. Buchholz to discuss what the doctor labeled his "mainly sensory peripheral polyneuropathy." Tr. 269. The doctor noted that, after reviewing earlier imaging, he was not surprised surgery did not solve Anderson's problem. He also commented that Anderson was doing "much better on gabapentin three times a day." *Id.* When Anderson expressed

Page 7 - OPINION AND ORDER

concern about not being able to work as a heavy equipment mechanic, the doctor agreed it could be true since he doubted the condition would improve.

In May 2012, Dr. Buchholz noted Anderson had controlled his pain well with a new long-acting form of gabapentin and that the neuropathy appeared to be stable.

Finally, Dr. Buchholz treated Anderson in August 2012, at which time Anderson reported creeping sensory loss up to his knees, decreased balance, and clumsiness. The doctor checked carefully and did not find anything wrong with Anderson's motor functioning, just continuing sensory loss. They discussed cutting the gabapentin back to decrease Anderson's fatigue during the day.

Anderson told Dr. Kenny in January 2013 that reducing the gabapentin made the pain worse. With the medication he could stand on his feet or walk, but not more than two hours in a day. He reported being unable to feel his feet and falling.

Anderson saw Dr. Kenny in March and again in July 2013, and added Cymbalta and Lyrica to his prescriptions. Dr. Kenny completed a function report in which she opined Anderson felt pain and numbness in his feet, making it difficult to walk. She thought he could sit for less than two hours in an eight-hour workday, and stand/walk for less than two hours in an eight-hour workday. She thought he would need to elevate his legs 80% of the work day and that he could rarely lift 10 pounds. She thought he would be off task 25% or more of the day and would miss more than four days a month. Tr. 293.

Dr. Buchholz also completed a function report. He noted Anderson's pain, paresthesias, sensory loss, and burning feet. He thought Anderson could sit for 20 minutes at one time for a total of four hours, and stand for 20 minutes at a time for a total of 2 hours. He thought

Page 8 - OPINION AND ORDER

Anderson would need to take one or two unscheduled five-minute breaks during the day, and should elevate his legs about half of the day. He thought Anderson could frequently lift 10 pounds and occasionally lift 20 pounds. The doctor noted no limitations on using his hands, fingers, or arms, but thought Anderson would be off task 25% of the time. He did not think Anderson would be absent from work. Finally, he noted Anderson would be getting a spinal cord stimulator and that symptoms may improve. Tr. 297.

Anthony Hadden, M.D., treated Anderson in June, July, August and September. After a trial use of a spinal cord stimulator, Anderson reported significant pain relief–greater than 50%– and the ability to be more active and tolerate increased physical activity. He stopped taking Gralise and felt an increase in his energy levels. After surgical placement of the stimulator, he reported doing well and feeling pleased.

Dr. Kenny treated Anderson in September 2013, just before Anderson's hearing. She noted fibromyalgia was responding to Lyrica (suggesting missing treatment notes in which she diagnosed fibromyalgia), and she reported Anderson's spinal cord stimulator was working well for his feet. She noted Anderson's peripheral neuropathy was improving. Tr. 301.

After Anderson's hearing, and five weeks after the ALJ issued his decision, Dr. Hadden completed a functional capacities report indicating Anderson can sit and stand for at most a total of six hours. Tr. 218.

## DISCUSSION

Anderson challenges the ALJ's decision to give little weight to his treating physicians' opinions about his functional limitations, as well as rejecting his testimony. Additionally,

Anderson urges me to consider Dr. Hadden's opinion– the additional evidence he submitted to the Appeals Council.

I.      Medical Evidence

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

Here, because the treating physicians' opinions[1] were contradicted by the state agency consulting physicians, the ALJ was required to give specific and legitimate reasons supported by substantial evidence in the record to reject them.

A.      Dr. Kenny

---

[1] There is neither evidentiary nor regulatory support for the Commissioner's assertion that Dr. Buchholz was not a treating physician.

The ALJ rejected Dr. Kenny's functional limitations, finding that Dr. Kenny described Anderson as having fewer functional abilities than he himself testified to having and that other record evidence indicated he had. In addition, Dr. Kenny pointed to diagnoses for which there was no support in the record, such as fibromyalgia, and her treatment notes did not contain significant objective findings to support the level of limitation she opined.

The ALJ gave specific and legitimate reasons to give little weight to Dr. Kenny's opinion. Indeed, as the ALJ pointed out, Dr. Kenny's functional limitations were more restrictive than those Anderson himself identified–for example, Anderson testified to being able to lift 20 pounds, while Dr. Kenny limited him to rarely lifting 10 pounds, and he elevated his legs half the day while Dr. Kenny indicated a need to elevate 80% of the day. In addition, as the ALJ noted, Dr. Kenny reported the effectiveness of medication, that Anderson's examinations were unremarkable, and yet that Dr. Kenny "essentially described the claimant as being unable to walk," that he would need to use an assistive device to walk, and that he was incapable of even low stress work. Tr. 23, 27. As the ALJ pointed out, Dr. Kenny's treatment notes did not indicate any objective findings that would support most of the restrictions she gave for Anderson's functionality. An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is " conclusory, brief, and unsupported by the record as a whole[.]" *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).

However, Dr. Kenny's notations about Anderson's sitting and standing limitations are somewhat consistent with those given by treating physician Dr. Buchholz (although more restrictive), and since I find the ALJ did not provide specific and legitimate reasons to reject Dr. Buchholz's opinions (discussed below), I similarly conclude the ALJ did not give specific and

Page 11 - OPINION AND ORDER

legitimate reasons to find Anderson capable of sitting, walking and standing to the extent required by light work.

      B.    <u>Dr. Buchholz</u>

The ALJ gave some weight to Dr. Buchholz's opinion, although he felt the doctor relied too much on Anderson's reports about his abilities because his interactions with Anderson were limited. The ALJ thought Anderson himself testified to the ability to do more than Dr. Buchholz found Anderson capable of. In addition, the ALJ suggested, neither the doctor's notes nor the other evidence in the record was consistent with the degree of limitation opined by the doctor. The ALJ specifically noted Anderson did not mention any need to elevate his legs, and the notes did not carry such a recommendation. The ALJ thought Anderson's reporting was not consistent with the doctor's belief that Anderson would be off task more than a quarter of the day.

While Anderson contends plaintiff had an abnormal EMG and nerve conduction studies which he argues provide the objective findings necessary to support the limitations given here, Tr. 221, these were the tests conducted by Dr. Miller which Dr. Buchholz questioned; they are not support for Dr. Buchholz's opinion about Anderson's limitations. *See* Tr. 269 (noting discrepancies in tests and questioning existence of tarsal tunnel syndrome). The remaining tests revealed mild findings. Tr. 228 (MRI showing mild abnormalities), Tr. 258 (SPECT scan revealing mild abnormalities), Tr. 259 (essentially negative CT scan).

Nevertheless, as Anderson points out, he testified he spent half of his day in a recliner, and explained to the ALJ that he reclines because his pain lessens when he keeps weight off of his lower extremities. Tr. 59. Thus, contrary to the ALJ's findings, Anderson's testimony is consistent with Dr. Buchholz's opinion that Anderson must elevate his legs during the day. In

addition, Dr. Buchholz's treatment notes contain objective findings to support the limitations he gave, such as diminished sensation in Anderson's feet, pain and stiffness in his back, diminished reflexes, and abnormal monofilament tests. Indeed, contrary to the ALJ's findings, nothing in Dr. Buchholz's opinion indicates he relied on Anderson's self-reports or that the doctor had limited exposure to Anderson or his functioning. To the contrary, Dr. Buchholz saw Anderson on four occasions and, as a neurologist, was in the best position to assess Anderson's functionality. The ALJ's reasons for only partially crediting the functional limitations identified by Dr. Buchholz are not specific and legitimate, and are not supported by substantial evidence in the record.

II.     Anderson's Credibility

Anderson testified to spending his days making coffee, taking care of his dogs, maybe going outside and raking a few leaves, napping for an hour or two, and then playing on the computer for three or four hours while sitting in his recliner. He conceded the stimulator, when it was on, gave him some relief when doing normal activities around the house. He turned it off when driving and sleeping, so he used pain medications then. He experienced grogginess from the medications. He could use his riding lawnmower and he could garden on his hands and knees. He also engaged in limited fishing, camping and hunting activities, but he depended on everyone else to assist him. "I basically am the lawn chair type of person now." Tr. 50. He drove to the post office or the store three times a week. He attended Elks Club events. He thought he could stand for no more than ten minutes and he thought he could sit for 20 minutes at a time. He thought he could lift 20 pounds. He thought he could walk a mile on good days, but not all at one time and very slowly, and less than 1/8 of a mile on bad days. He testified he

Page 13 - OPINION AND ORDER

stopped working due to his foot pain, but conceded he was laid off from his work at the same time. He did not look for work while he collected unemployment.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[2]

The ALJ found Anderson not entirely credibly about the extent of his limitations for several reasons: (1) Anderson continued to work despite longstanding problems; (2) his alleged

---

[2] The Commissioner does not recite the clear and convincing standard in her brief and instead suggests some more deferential standard applies. Def.'s Br. 11 (citing SSR 96-7, 1996 WL 374186, at *4). The Ninth Circuit has routinely held that the ALJ must provide "specific, clear and convincing reasons" to support the credibility analysis. *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014).

Page 14 - OPINION AND ORDER

onset date is the date he was laid off, not when his condition began or changed; (3) he collected unemployment benefits, which required him to assert he was ready, willing and able to work; (4) his activities of daily living were normal, and did not support the degree of limitation he alleged; and (5) the objective evidence is not consistent with his testimony.

Anderson testified that he struggled to perform his job, even before he was laid off, and the medical records are consistent with this testimony. He told Dr. Miller he had experienced paresthesia for the past six months. Indeed, Anderson testified he often had to stop the truck three times while on his route in order to get out and walk around to deal with the pain. As a result, the ALJ's speculation that Anderson could have continued to work had he not been laid off is not supported by substantial evidence in the record.

Additionally, because it is not clear whether Anderson held himself out for full or part-time work, his receipt of unemployment benefits cannot be a credibility factor. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). Indeed, Anderson's testimony is that he did not look for work while collecting unemployment because he was unable to work.

Anderson is also correct that in his case his daily activities are not a clear and convincing reason to question his credibility. Daily activities could be relevant for one of two purposes. A claimant's daily activities might be so substantial such that they equate to an ability to work. *Orn*, 495 F.3d at 639. Alternatively, the activities might be inconsistent with testimony purporting to be limited in some way. *Id.* Here, the ALJ felt that Anderson's daily activities were inconsistent with his testimony about his limitations, but none of the activities suggested Anderson could function at greater levels than he reported. He described his participation in hunting, fishing, and camping activities as "lawn chair" type participation. His ability to rake

Page 15 - OPINION AND ORDER

leaves, garden, and do the dishes is not inconsistent with his testimony that he could stand and walk ten minutes at a time. Nor is his involvement in community organizations inconsistent with his stated limitations.

That leaves only the ALJ's reason that the objective evidence was inconsistent with Anderson's testimony. However, while medical evidence may be a relevant factor in determining the severity of the pain and its disabling effects, the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Even if objective medical evidence alone could constitute the sole support for the ALJ's conclusion about Anderson's credibility, the record here evidences Anderson's pain and lack of feeling in his feet, and his continued attempts to treat his pain, including the implantation of a spinal cord stimulator.

III.     Additional Evidence

Dr. Hadden prepared a functional statement, limiting Anderson to sitting and standing a combined total of six hours. The Appeals Council declined to consider the opinion, finding it to be information about a later time than the period adjudicated here. The parties dispute how I should treat this evidence. Since I reverse and remand for a finding of disability, I do not need to address this evidence.

IV.     Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits. *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a

Page 16 - OPINION AND ORDER

determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Alternatively, the court can remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

Anderson's treating physicians limited Anderson to sitting, standing, and walking for a total of less than eight hours in a workday. There was no contrary evidence from any treating or examining source. In addition, all of the treating and examining sources opined Anderson would need to elevate his legs. Given Anderson's consistent testimony, which the ALJ did not properly reject with clear and convincing reasons, the ALJ was required to find Anderson disabled. Specifically, at the hearing, the vocational expert ("VE") testified that an employer would not permit an employee to keep his legs elevated while in a seated position because such a position "affects processing speed." Tr. 68. In short, the Commissioner cannot meet her burden at step 5 of the sequential analysis to show that there are other jobs in the national economy Anderson can perform. Thus, this is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, . . . [making] remand for an immediate award of benefits . . . appropriate." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).

///

///

## CONCLUSION

The decision of the Commissioner is reversed. The case is remanded for a finding of disability.

IT IS SO ORDERED.

DATED this ___6th___ day of July, 2016.

                                                 /s/ Garr M. King
                                               Garr M. King
                                               United States District Judge